UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 15-cr-10338-FDS |
| | ) | |
| LUIS SOLIS-VASQUEZ, | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Luis Solis-Vasquez hereby submits this memorandum in advance of the sentencing hearing scheduled for Tuesday, November 20, 2018, at 10:00 a.m.

Mr. Solis-Vasquez, "Brujo," was convicted after trial of Count 2 of the indictment (the RICO conspiracy count), and was found by the jury to be responsible for the murder of Javier Ortiz.   As a result of this conviction, he faces a statutory maximum sentence of life imprisonment.   According to Probation's calculation, the guidelines yield a recommendation  of life imprisonment (OL 43, CHC I).

Mr. Solis-Vasquez advances several objections to Probation's guidelines calculation; the Court has ruled on many of these objections already.

Regardless of the Court's resolution of these objections, counsel urges the Court to downwardly vary and impose a sentence significantly less than life imprisonment; we request the Court impose a sentence of 30 years[1].

---

[1] If sentenced to 30 years' imprisonment, Mr. Solis-Vasquez could expect a release date of 1/29/2046, when he is 55 years old (his date of birth is in August 1990), and well into the period of general desistance from crime.  Under current law, he would be eligible for no more than approximately 3.8 years of good conduct time.

We cite Mr. Solis-Vasquez's background, lack of criminal history and relative youth--he was 24 at the time of the Ortiz murder--as reasons supporting the request.   We also point to the nature of his conduct, which warrants a severe but, not the maximum sentence.   He did not, in fact, kill anyone.   Our proposal avoids the potential for unwarranted disparity with the sentences imposed on co-defendants; the proposal also avoids the prospect of appearing to exact a trial penalty on Mr. Solis-Vasquez, who prior to trial turned down a proposed (c)(1)(C) plea agreement of between 23 to 26 years.   This constitutes a range the government, based on the same offense conduct, then regarded as a reasonable disposition of the case, assuming acceptance of responsibility.   Finally, our proposal amply fulfills the purposes of punishment, while remaining faithful to the parsimony principle, that a sentence not be greater than necessary to fulfill those purposes.

## **Legal Framework**

The sentencing statute—18 U.S.C. § 3353—provides that the Court:

shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2), and ... in determining the particular sentence to be imposed, shall consider—
 (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
 (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(1), (a)(2).

After *Booker*, the Court is required to consult, but not follow, the recommendations of the Sentencing Guidelines.   The Court "shall consider":

(3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for— (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... issued by the Sentencing Commission …

18 U.S.C. § 3353(a)(3), (a)(4).

The Court is also required to consider:

(7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct...

18 U.S.C. § 3553(a)(7).

In this memorandum, we first outline objections to Probation's sentencing guidelines range, then discuss the 3553(a) factors.

## Objections to the Guideline Calculation

Based on the statement of facts submitted by the government, Probation has calculated the Sentencing Guidelines and arrived at an adjusted Offense Level (OL) of 43, which leads to a guideline of life imprisonment.

Mr. Solis-Vasquez should be found responsible for second degree, not first degree murder, based on the evidence at trial regarding the Ortiz murder.   We detail this objection below.  We raise additional objections to Probation's calculations regarding the other racketeering acts, acknowledging that the the Court has ruled on many of these disputed issues in related cases.

The Sentencing Guidelines calculation by Probation is as follows:

| | | |
|---|---|---|
| OL | 43 | Javier Ortiz murder [First degree murder] |
| OL | 37 | Saul Rivera [Attempted first degree murder] |
| OL | 35 | Mynor Ochoa [Attempted first degree murder] |
| OL | 35 | Flores [Attempted first degree murder] |
| OL | 30 | De Paz [Accessory-after-the-fact] |

Combined offense level after application of grouping rules:

| | | |
|---|---|---|
| OL | 43 + 3 = | 43 [Life] |

These guidelines calculations are based on thin proof of intent to murder, and appear to be guided by an assumption that every attack committed by an MS-13 member is made with the specific intent to kill the victim, and can therefore be legally characterized as an "attempted murder." This assumption bootstraps MS-13's fearsome motto "mata, viola, controla" ("kill, rape, control") into a motive to murder for every violent act any member made, relieves the government of its burden to supply sufficient evidence of intent, is implausible and unwarranted[2].

Mr. Solis-Vasquez submits the following guideline calculation is the correct one:

---

[2] The government's own indictment asserts that MS-13 had multiple "purposes" and "goals," including: "[p]reserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, *violence, threats of violence, assaults, and* murder"; (b) promoting the enterprise and its criminal activities; (c) keeping victims and community members in fear" among others. Fifth Superseding Indict. ¶¶ 23-24.

Not every violent attack was an attempted murder. Not even the frequently used term "hit" necessarily connoted an intent to kill. The government's witness, Mauricio Sanchez (Tigre), one example, testified that he was told "now you're in MS, and you have to represent, you have to go out and do hits." "What are hits?" "To go stab rivals." Tr. 04/13/2018, Day 15, at 79.

| | | |
|---|---|---|
| OL | 38 | Javier Ortiz [Second Degree murder] |
| OL | - | Saul Rivera [Not within scope] |
| OL | - | Mynor Ochoa [Not attempted murder - Intent] |
| OL | - | Flores [Not attempted murder - Intent] |
| OL | - | Accessory-after-the-fact [Insufficient evidence] |
| | | |
| OL | 38 | 38 [235-293] |

Objection #1   - The Murder of Javier Ortiz

As the Court is aware, Mr. Solis-Vasquez stands convicted of Count 2 of the indictment, conspiracy to commit racketeering, in violation of 1962(d).  The jury also rendered a special verdict, finding Mr. Solis guilty of either second or first degree murder as a joint venturer, having performed the function of  "armed backup" according to the government's opening and closing arguments.

The guidelines provide that a conviction of racketeering leads to an OL of 19 or the "offense level applicable to the underlying racketeering activity."  USSG §2E1.1.  Probation based its guideline calculation on the finding that the underlying racketeering was the first degree murder of Javier Ortiz, and began with OL 43.  It then applied grouping rules, which would have led to an increase in offense level, had Mr. Solis-Vasquez not already been at the maximum.

Mr. Solis-Vasquez's participation in the murder as a joint venturer warrants a finding of second degree murder.  Massachusetts law provides that a joint venturer in a first degree murder

is not necessarily equally culpable; the principal's intent is not automatically imputed to him.
*See Commonwealth v. Tavares*, 471 Mass. 430, 441 (2015).

The evidence at trial does not establish that Mr. Solis-Vasquez harbored an intent to kill
Ortiz.

On the night of the murder, Vida Loca urgently called Crazy and asked Crazy to supply
him with a gun when Vida Loca saw Ortiz, his assailant from the night before, at the speakeasy.
There was no evidence that Vida Loca had been out looking for the victim.  Indeed, the
circumstances suggest the opposite: Vida Loca was unarmed, and desperate to have Crazy
provide him the gun before his assailant left.  Muerto, the government's principal witness for
these events, testified that the majority of any "planning," such as it was, that occurred between
Vida Loca and Crazy took place on the phone outside the garage where the group of men were
gathered.  Mr. Solis-Vasquez was therefore not directly privy to the exchange.  Tr. 04/06/2018,
Day 9 at 112.

The ride to the speakeasy was provided by Checha, who appeared on the scene, it seems,
by happenstance.  Muerto testified that he believed the hastily planned escapade to be unwise,
because he believed Vida Loca was likely drunk, and not of clear mind or judgment.  He asked to
be dropped off at home, before the remaining four men proceeded to the speakeasy.  Tr.
04/06/2018, Day 9 at 113.

Muerto and Tigre testified that Brujo carried a firearm with him.  Muerto says he saw that
Brujo had a 9mm handgun belonging to another gang member (Humilde) on him, while Tigre
testified Brujo had a .22.  Mr. Solis-Vasquez did not necessarily carry this firearm as part of a

plan to murder the victim, however.  The government itself asserts that Mr. Solis-Vasquez was provided a gun by the ESLS clique "for his own protection."  PSR ¶ 24.

Muerto testified that when Crazy provided Vida Loca with the .380 and asked to go upstairs, Vida Loca insisted on going alone for a moment, before learning that Brujo carried a gun as well.  It was upon learning this that Vida Loca asked Mr. Solis-Vasquez to come upstairs and guard the door.  Muerto testified that Mr. Solis-Vasquez said he "stayed at the door and Vida Loca went inside."  Tr. 04/06/2018, Day 9, at 115.  Muerto testified Mr. Solis-Vasquez was at the "door when he heard that somebody was on the porch outside, and so he went to the porch and [ESLS homeboy] Vincentino was at the porch."  Id.  Mr. Solis-Vasquez was on the porch with Vincentino, lighting a cigarette, when Vida Loca "started shooting inside."  Tr. 04/06/2018, Day 9, at 116.

Muerto did testify that Brujo brought the gun with knowledge that a confrontation or attack was in the works. Tr. 04/06/2018, Day 9, at 116.  But he did not testify that Mr. Solis-Vasquez had knowledge that the plan was to murder Mr. Ortiz.  Id.

> Crazy said he was going to go and bring the gun to Vida Loca.  Brujo lived at the garage, so Brujo said that he would go as well because he had a 9 millimeter at the garage. Humilde from TLS had given that gun to Brujo to have there with him at the garage.

Tr. 04/06/2018, Day 9, at 116.

Muerto also testified that Brujo's presence with the gun was not part of a preplanned "plan of attack."  The government's suggestion that Mr. Solis-Vasquez performed the function of "[a]rmed back up" as part of a premeditated plan does not comport with this testimony.  Muerto testified: "Vida Loca had only said to Crazy to bring the gun, and since Brujo had a gun there, he took it along as well."  Tr. 04/09/18, Day 10 at 77.

7

This is insufficient evidence to support a first degree murder finding against Mr. Solis-Vasquez.  There is, in fact, compelling evidence to the contrary.  Mr. Solis-Vasquez told Tigre that he thought the purpose of the trip was to intimidate a rival, *not* to kill him.

Tigre admitted on cross-examination that Mr. Solis-Vasquez told him that he "thought Vida Loca was just going to scare the man with the gun, instead Vida Loca immediately shot the man and killed him."  Tr. 04/13/2018, Day 14, at 128.

Tigre also testified that Mr. Solis-Vasquez stated he had gone with the requisite "intention" to kill at the clique meeting at which the attack was later discussed and celebrated. Tr. 04/13/2018, Day 14, at 129.  When asked on direct examination about what Brujo told him about his intentions he said: "[t]hat he was going--that he was ready for what he was going to do."  Tr. 04/13/2018, Day 14, at 96.

In the circumstances of this case, the former statement, presumably provided to Tigre in confidence, is more probative and credible than the latter statements.  In the context of MS-13, it is akin to making a statement against penal interest for a member to disavow murderous intent in such an interaction.  Mr. Solis-Vasquez's acceptance of partial credit for the murder at a subsequent clique meeting is less probative of his intent than the unguarded statement to Tigre that the killing came as a surprise.  Exh. 1 (Exh. for ID. 326, GD-38471).

This comment, along with other circumstances of the case, strongly supports the notion that Mr. Solis-Vasquez did not harbor a specific intent to kill, but rather an intent to threaten, intimidate or inflict injury.

The testimony of the percipient witness, Saul Rivera, who was shot in the chest, is not inconsistent with the supposition that Mr. Solis-Vasquez did not harbor a specific intent to kill.

According to Rivera, Mr. Solis-Vasquez did not in fact guard the door, but crossed the kitchen with Vida Loca and met with Vincentino on the back porch.  Tr. 04/12/2018, Day 13, at 33-34. Vida Loca, according to Rivera, came back inside, then shot the victim Ortiz, apparently as Ortiz emerged from the bathroom.  Vida Loca then gratuitously shot Rivera, who sat in a chair across the room.  Mr. Rivera, a restaurant worker, was not gang involved. Id.

The near contemporaneous recording, of Crazy, and Muerto's brother, Danger, in the car with the government's CW-1 (Pelon), made the next day, is also not inconsistent with the proposition that Mr. Solis-Vasquez did not harbor a specific intent to kill.  Rather, it merely places Mr. Solis-Vasquez at the scene, with the gun.  Neither of the speakers were witnesses to what occurred inside the speakeasy.  PSR ¶ 35.

The Court has already ruled that Vida Loca's conduct constituted premeditated murder. However, evidence admitted at trial and other evidence suggests that Vida Loca was consuming prodigious amounts of alcohol, and using cocaine, on the night of murder.  This makes his account to police--that he had woken up after a blackout with the notion that he had done something wrong--at least plausible.  Buttressing this is his cavalier statement that if he had indeed gone back to the speakeasy, "it would have been for revenge."[3]  Trooper Connor Affidavit, 12/14/2014, ¶ 1.

Marvin Alvarado, whom Isolina Echeverria, the speakeasy proprietor, identified as someone who was present and whom she knew, told police he was with Vida Loca on the night of the murder, and describes a bout of excessive drinking.  Alvarado Interview, 12/14/2014.  He

---

[3] After his arrest, Mr. Enamorado stated to police: "that he didn't remember anything from that point on because he was drunk and was using cocaine. He stated that if he went back it was for revenge. He said that he went home to … and woke up early in the morning. He said he knew something bad had happened and he left home." Trooper Connor Affidavit, 12/14/2014, ¶ 1.

told detectives that the two, after a party, proceeded to a parking area next to his building where they drank beer, brandy, and used cocaine. He stated that they drank "all the alcohol they had, and then decided to go to 60 Chester Avenue [the speakeasy]."  Alvarado Interview, 12/14/2014.

The Ortiz attack was impulsive and poorly planned, in marked contrast to the evidence of other MS-13 murders in this case.  Vida Loca committed the murder in a speakeasy operated by his own next door neighbor, who knew him well, vastly increasing the chances he would be identified.  While there was no direct evidence that Mr. Solis-Vasquez was ingesting drugs or drinking on this particular night, it may be inferred that he was.  This evidence of intoxication should be considered by in assessing whether first or second degree murder is the appropriate guideline.

Objection #2 - Attempted Murder of Saul Rivera

Mr. Solis-Vasquez should not be held accountable for the attempted murder of Saul Rivera under the guidelines.  The evidence at trial showed that Mr. Rivera was an innocent bystander who did not know the parties and had no involvement with gangs or any gang dispute.

Even in the context of the murderous plan, Vida Loca's gratuitous shooting of Saul Rivera was likely the result of a mistake or an irrational and impulsive act.  It is undisputed that Mr. Solis-Vasquez was on the porch at the time of the shooting of both Ortiz and Rivera.  He would have had no advance knowledge of the shooting of Rivera.

The Rivera shooting is therefore not conduct for which Mr. Solis-Vasquez may be held accountable under USSG § 1B1.3, the relevant conduct guideline.  That guideline provides that:

[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor,

or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), [the guideline shall be determined based on] all acts and omissions of others that were—

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense

USSG § 1B1.3(a)(1)(B)

Here, the proper approach is to define the scope of the criminal activity not amorphously, to sow terror for example, but narrowly: the criminal activity was an attack on a rival 18th  street member, Ortiz, who had attacked and assailed the honor of Vida Loca the day before.[4]  While it may have been "foreseeable" that Vida Loca could shoot someone by mistake or for other reasons, this *ultra vires* shooting of an innocent bystander was not within the scope of the jointly undertaken criminal activity, and did nothing to further its purpose.

The notion that Vida Loca shot Rivera as an "attempt to avoid detection" or as part of a plan to silence a witness is speculative and should be rejected.  Of note, there were many possible witnesses at the speakeasy at the time of the shooting, making the singling out of Mr. Rivera for this reason less plausible.

---

[4]  The application note provides: "the scope of the 'jointly undertaken criminal activity; is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant," and "the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." USSG § 1B1.3, comment. N.3.

Even if he is held accountable under the relevant conduct guideline on a theory that the shooting of Mr. Rivera was within the scope and in furtherance of the Ortiz murder, or on a broader theory that it was a racketeering act involving murder that was a part of the overall racketeering conspiracy, the guideline for this offense group should be lower.

Probation determined the OL for the Rivera attempted murder to be 37.  PSR ¶¶ 68-72. USSG §2A2.1.

| OL | 33 | Object of offense is first degree murder |
|----|----|------------------------------------------|
|    | +4 | Life-threatening or permanent injury. |
| OL | 37 | |

As there is no evidence Mr. Solis-Vasquez intended the murder of Mr. Rivera, his guideline should be calculated as if the object of the offense was not first degree murder, but second degree.  This would result in the following guideline calculation.

| OL | 27 | Object of offense not first degree murder |
|----|----|-------------------------------------------|
|    | 4  | Life-threatening or permanent injury. |
| OL | 31 | |

Objection #3 - <u>Mynor Ochoa</u> - <u>Attempted Murder</u>

There is insufficient evidence that this attack was an attempted murder, rather than an aggravated armed assault. It therefore does not constitute a racketeering act under 18 U.S.C. § 1961, and should not properly be used to calculate the guideline range.[5]

According to Muerto's testimony, he was on his way to lunch with the government's confidential informant, Pelon (CW-1), when Muerto received a call from Mr. Solis-Vasquez. Mr. Solis-Vasquez told Muerto he "was at the park in Chelsea … that there were a whole lot of chavalas there, and that [he]had gone to buy some marijuana and the guys had attacked him." Tr. 04/09/2018, Day 10 at 24-25. Mr. Solis-Vasquez sought help to retaliate. Muerto testified that he demurred, as he was unarmed, until Pelon suggested a nearby source for a weapon, Domingo. Id. at 25.[6]

According to Muerto, he, Pelon, and Domingo, who carried the knife, joined Mr. Solis-Vasquez, Vago and Vampiro at the park. Muerto was dressed in MS-13 regalia, a "blue baseball cap and blue shorts and blue Nike Cortez." Tr. 04/09/2018, Day 10 at 26.

> The chavalas stared at us, they stared at me, and one of them said to the others to attack us. So when he said that, I stood there and I said … I flashed the MS, and I said, "Mara Salvatrucha, sons of bitches."
>
> [T]hey all tried to come towards where we were standing … and one of them pulled out a knife. And so I said to Domingo to hand me the knife that he had. [W]hen they saw that

---

[5] In the event that an aggravated armed assault were used to set the guideline range, the resulting OL would be 23 (OL 14, + 4 for use of a dangerous weapon, + 5 for serious bodily injury). *See* USSG §2A2.2. Under the grouping rules, these attacks would not affect the guideline range where the range is set by second degree murder (OL 38). USSG §3D1.4

[6] This suggests that the retaliatory attack would not have occurred, at least not in the same way, but for Pelon's suggestion and participation.

Domingo did pull out the knife and handed it to me, all the 18s started running away. One of them went out towards the parking lot.  They all went in different directions.

I saw that one of them got knocked down to the ground.  I didn't see who had knocked him down, but I saw that Brujo was beating him down, and the 18 was trying to get under a car.  And that's when I came over with the knife.  That's when I started like stabbing him with the knife down, and the 18 was kicking his feet up, so then with his feet he pushed the knife aside, and I cut my hand with it.

Tr. 04/09/2018, Day 10 at 26.

Muerto then went to the home of Playa, to attend to his injured hand.  Afterward, the men re-grouped, and discussed the event.  Mr. Solis-Vasquez, in a conversation recorded by Pelon (CW-1), bragged that he "would have gone back," but for some unforeseen circumstance that is not specified.

I was kicking him.  I was kicking him with my feet on his head. … And that other kid didn't let me keep going.  With three kicks in the face, I was able to [unintelligible].  The other kid was kicking him like crazy. … [A]s soon as he fell Muerto was hitting him.

Tr. 04/09/2018, Day 10 at 29.

This is the sum total of the evidence related to the attack on Mynor Ochoa that was entered into evidence at trial.  Notably, the government did not elicit a statement from Muerto whether his intent was to seriously injure or bring about the death of the victim.  Neither is there anything in the transcripts that suggest an intent to kill necessary to classify the attack as an attempted murder.

In the event that attack is classified as an attempted murder, the guideline should be lower.

Probation determined the OL for the Ochoa attempted murder to be 35.  PSR ¶¶ 73-76. USSG §2A2.1.

| OL | 33 | Object of offense is first degree murder |
|---|---|---|
|  | +2 | Serious bodily injury. |

| OL | 35 |  |
|---|---|---|

As there is no evidence Mr. Solis-Vasquez intended the murder of Mr. Ochoa, his guideline should be calculated as if the object of the offense was not first degree murder, but second degree.  This would result in the following guideline calculation.

| OL | 27 | Object of offense not first degree murder |
|---|---|---|
|  | +2 | Serious bodily injury |
|  | 29 |  |

Objection #4 - <u>Attempted Murder - Santos Flores Ramirez</u>

As in the case of the Ochoa attack, there is insufficient evidence that this attack was an attempted murder, rather than an aggravated armed assault.  It therefore does not constitute a racketeering act under 18 U.S.C. § 1961, and should not properly be used to calculate the guideline range.

Muerto and Tigre testified that Mr. Solis-Vasquez admitted to participating in a stabbing of a "chavala," or rival gang member, with Animal. PSR ¶ 54.   The government's cooperating witness, CW-1 (Pelon), recorded conversations with Animal and Mr. Solis-Vasquez, in which

both men admitted to and bragged about stabbing a chavala.  Animal says he held the victim, while Mr. Solis-Vasquez stabbed him.  PSR ¶¶ 52-53.

This attack was not charged as a predicate act in the indictment.  No other evidence of this attack, or the injuries sustained by the victim, were introduced at trial. Based on the Chelsea Police Department report, this appears to have been a disturbing attack on an innocent bystander who was evidently not gang involved.  Exh. 2

However, this evidence also suggests this was not an attempted murder, but an assault with an intent to sow fear.  There appear to have been four men involved in the attack.  Even the comment made by one of the men to the victim, "you're going to die," is not necessarily probative of intent to murder, but rather to strike fear in the victim.

Despite Animal and Mr. Solis-Vasquez's expansive bragging about the incident afterward, the Chelsea Police described the victim's injuries as being "minor," as follows:

> Flores Ramirez sustained a fractured right forearm and a minor stab wound to the lower right side of his back. … He was released from MGH on [the day of the attack] five and a half hours after being admitted.

Exh. 2.

Probation determined the OL for the Santos Flores Ramirez attempted murder to be 35. PSR ¶¶ 77-80.  USSG §2A2.1.

| OL | 33 | Object of offense is first degree murder |
|----|----|------------------------------------------|
|    | +2 | Serious bodily injury[7]                 |

---

[7] The injuries, as described by Chelsea Police, clearly do not meet this standard for "serious bodily injury." The term is defined  as "injury involving extreme physical pain or the <u>protracted impairment</u> of a function of a bodily member, organ, or mental faculty; or <u>requiring medical</u>

OL     35

As there is insufficient evidence to establish that Mr. Solis-Vasquez intended the murder of Mr. Flores Ramirez, his guideline should be calculated as if the object of the offense was not first degree murder, but second degree, in the event that the argument the attack is in fact assault and battery with a dangerous weapon is rejected.  This would result in the following guideline calculation.

OL     27                        Object of offense not first degree murder

       +0                        No serious bodily injury

OL     27

Objection #5 - Accessory after the fact - Irvin de Paz

In the Presentence Report, Probation recounts how Animal murdered Irvin de Paz to advance his own position within MS-13.  It found Mr. Solis-Vasquez responsible as an accessory after the fact to this murder based on his presence at the clique meeting several months afterward at which Animal was inducted (beat in) into the gang.

---

intervention such as surgery, hospitalization, or physical rehabilitation."  USSG § 1B1.1, comment. n. 1(L).

| OL | 30 | Accessory After the Fact |
|----|----|----|

| OL | 30 | |
|----|----|----|

It based the guideline calculation on the following statement of facts:

On January 8, 2016, SANDOVAL, GUZMAN, HERNANDEZ-MIGUEL, SOLIS VASQUEZ, and other ESLS homeboys were present at the Everett garage to jump-in (or promote) JOEL MARTINEZ to homeboy status and to welcome him as a full member of MS-13. While at the garage, ESLS members discussed what it took to become a member of MS-13, discussed ways to take credit for the murder of De Paz, and ways to shield JOEL MARTINEZ from the police. During the discussion, SOLIS VASQUEZ expressed unequivocal support for bringing JOEL MARTINEZ into the ESLS clique and agreed they should support him financially while the police investigation of the De Paz murder was ongoing. SOLIS VASQUEZ explained that ESLS needed new members like JOEL MARTINEZ, who were willing to hit the streets and represent MS-13 "the right way," and not a "bunch of young dudes" who were only "here all the fucking time just because they are at the bars . . . No man. Let them come and kill. Let them come and feel the pressure... they need to stick the knife in . . . to stick the knife in and see what happens . . . if you have love for the Barrio, you will show your balls there."

PSR. ¶ 55.

Mr. Solis-Vasquez objects to this calculation because (a) he asserts "accessory after the fact" is not a crime involving murder and so not a racketeering act that may be used to set an offense level[8]; (b) Mr. Solis-Vasquez's presence at the meeting at which providing assistance to Animal was merely discussed, despite his endorsement of violence and his participating in the "beat in" of Animal, does not constitute being an accessory after the fact.

Alternative guideline calculation [Grouping value in parenthesis]

| OL | 38 [1.0] | Javier Ortiz [Second Degree murder] |
|----|----|----|

---

[8] Mr. Solis-Vasquez adopts the arguments on this point presented by Edwin Guzman (Playa), ECF 2813, at 22-23.

| | | | |
|---|---|---|---|
| OL | 31 [0.5] | | Saul Rivera [Second Degree] |
| OL | 29 [0] | | Mynor Ochoa [Second Degree] |
| OL | 27 [0] | | Flores [Second Degree] |
| OL | 30 [0.5] | | Accessory-after-the-fact [Insufficient evidence] |

Final calculation after application of grouping rules:

| | | | |
|---|---|---|---|
| OL | 40 | | 40 [292-365] |

### The 3553(a) Factors

<u>History and Characteristics of the Defendant</u>

Mr. Solis-Vasquez was born in August of 1990 in Chalatenango, El Salvador.  He is 28 years old.  His mother, Gladys Vasquez, left for the United States when Mr. Solis-Vasquez was a one-year old, leaving him to be raised by his older sisters.  PSR ¶ 102.  Gladys maintained contact by phone, and sent remittances.    While this distance is not described by Mr. Solis-Vasquez as a deprivation, it certainly was, and is characteristic of the extreme lengths to which Salvadoran families have gone to better their circumstances.

Mr. Solis-Vasquez's own account of his upbringing is spare--he is a laconic person.  He recounts experiencing no physical abuse as a youngster.  It bears reflection here that El Salvador is an unstable country, mired in chronic poverty, routine violence and and overrun by gangs like

MS-13 and 18th Street.[9]   The experience of growing up in such a place is far from the experience

of most of those who grow up in the United States.[10]

    According to mother Glady Vasquez, and Yessenia Marilu Solis Vasquez, the sister, 10

years his senior, who raised him, the purpose and hope in bringing Mr. Solis-Vasquez was not

purely economic, but to remove him from the pervasive influence of the gangs.  Alas, this was

not to be.

    Both describe him as humble and respectful, warm and kind; he was artistic and loved to

draw.   This description stands in marked contrast to the portrait of "Brujo" that emerges from

the transcripts in this case.  It is, however, consistent with Mr. Solis-Vasquez's comportment

during the trial of this case, as well as in his dealings with the undersigned, with whom he is

unfailingly respectful and solicitous.  The discrepancy brings to mind the adage that one should

not be judged solely by one's worst moment.

    <u>Mr. Solis-Vasquez's Age</u>

    Mr. Solis-Vasquez relative youth is a reason to exercise leniency.  He was, according to

the testimony at trial, 22 or 23 when he became a member of ESLS in 2013.  (He entered the

---

[9] The State Department's travel advisory for El Salvador reads in part: "Reconsider travel to El Salvador due to crime. Violent crime, such as murder, assault, rape, and armed robbery, is common. Gang activity, such as extortion, violent street crime, and narcotics and arms trafficking, is widespread. Local police may lack the resources to respond effectively to serious criminal incidents."  The CIA World Factbook notes: "A 12-year civil war, which cost about 75,000 lives, was brought to a close in 1992 when the government and leftist rebels signed a treaty that provided for military and political reforms. El Salvador is beset by one of the world's highest homicide rates and pervasive criminal gangs."

[10] The recent killing or disappearance of the mother of Mr. Solis-Vasquez's daughter, confirmed to the undersigned by his mother and sister, serves to punctuate this fact.

United States in 2010 or 2011).  He was 24 at time of the Ortiz murder and Mynor Ochoa attack, and recently turned 25 at the time of his arrest.

The developing research on brain development makes clear that the changes we associate with adolescence are not complete until the middle 20s.  Given that there is significant variation among individuals, we submit a court should pause before sentencing a young adult such as Mr. Solis-Vasquez to life imprisonment.  The personality of individuals in their mid-20s is likely not to be fully "set," and so more amenable to rehabilitation, and capable of growth in self-restraint and wisdom, than an older person.

Recent Supreme Court cases prohibiting resort to the death penalty or categorical resort to life imprisonment without the possibility of parole for juveniles[11] provide context for consideration of this issue.   In a recent case, *Cruz v. United States*, No. 11-cv-787-JCH, 2018 U.S. Lexis 52924 (D. Conn. Mar. 29, 2018) at \*22-26, the district court found the rule the Supreme Court announced in *Miller* applied to those who had attained the chronological age of 18, as well as those under the age of 18.  The court took testimony from Laurence Sternberg, one of the foremost researchers on adolescence and a principal author of two amicus curiae briefs submitted to the Supreme Court by the American Psychological Association.

That evidence demonstrates that many of the developmental changes associated with adolescence continue into the mid-20s.  *See Cruz*, *supra*, at \*22-26.  The research in this area remains at an early stage.  *Id*.  Professor Sternberg focused in his testimony and research on 18-21 year olds, and the similarities and dissimilarities of this group to younger adolescents.

---

[11] *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183 (2005); *Miller v. Alabama*, 567 U.S. 460, 132 SCt. 2455 (2012), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010).  See also *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016)

However, the research on brain development establishes that the brain matures on a continuum, and is not complete until the mid-20s.  *Cruz*, at *23, n. 22 (noting that Dr. Steinberg testified about a "linear development in impulse control from age 10 to age 25).  Elizabeth Scott, Richard Bonnie & Laurence Steinberg, "Young Adulthood as a Transitional Legal Category," 85 Fordham Law Rev. 641 (2016) ("Brain maturation comprises several processes that vary in their developmental timetable across brain regions and systems," and that while some systems are fully matured by the age of 16,  "connectivity, especially between the prefrontal cortex and brain regions that process rewards and respond to emotional and social stimuli, is not complete until the midtwenties.")  *See also* Mariam Arain, et al., "Maturation of the Adolescent Brain," 9 Neuropsychiatric Disease and Treatment 449, 450 (2013) Fig. 1 (defining period of adolescent brain maturation as from 10 - 25 years).

The authors of Young Adulthood conclude the section of entitled "Neurobiological Research: Brain Development in Young Adulthood" as follows:

> It is clear that the psychological and neurobiological development that characterizes adolescence continues into the midtwenties, but the research has not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one. Studies find continued development during this period but also find that, in some ways, young adults are similar to adults in their midtwenties. The research on age patterns in risk-taking and on emotional maturation-- particularly on impulse control in negative arousal states and peer influence in social contexts--provides the most powerful evidence that young adult offending likely represents a continuation of adolescent risk- taking, driven by developmental forces; but many uncertainties remain. The question is to what extent this still-developing body of research on young adults should affect justice policy.

*Id*. at  653.

Questions about the extent that "still-developing body of research on young adults should affect criminal justice policy" are not at issue here.  But this body of research provides empirical support for the notion that Mr. Solis-Vasquez's participation in these crimes may have been affected by his relative youth, and this is one reason to impose a lower sentence than otherwise.

<u>The nature and circumstances of the offense</u>

The government's account of the attack on Javier Ortiz, as a cooly premeditated hit, does not comport with the facts.  This was a "hot," not a "cool" sequence, that developed over the course of an hour or so.  Mr. Solis-Vasquez was not crucial to the scheme, and his presence, in the end, did not evidently contribute to its success.  The incident could have unfolded another way, but it did not.   There is also no evidence that any plan to which Mr. Solis-Vasquez agreed encompassed the gratuitous shooting of an innocent bystander, poor Mr. Rivera, which Mr. Solis-Vasquez did not even witness.

Similarly, Mr. Solis-Vasquez did not attack Mynor Ochoa with a knife; he attacked him with his feet.  When he called for Muerto's assistance in confronting the gang members (who, he said, had attacked him) in the park, he did not request that Muerto bring a knife.  The evidence shows that getting a knife from another MS-13 member was CW-1, Pelon's, idea.

And the facts of the "hit" where Mr. Solis-Vasquez *did* wield the knife, while revealing it to be a disturbing and apparently random attack, also reveal the victim was not seriously injured, contrary to Animal's and Brujo's account of the incident afterward.

This behavior warrants a significant sentence, of course, but also one that is tempered by the recognition that, of the defendants convicted of murder, Mr. Solis-Vasquez is perhaps  the least culpable.

<u>Avoid unwarranted sentence disparities among defendants in this case</u>.

Mr. Solis-Vasquez's offense conduct is less heinous than that of many of his co-defendants, and his sentence should reflect this, despite the fact that he exercised his trial right.  Mr. Solis-Vasquez's conduct in participating in the Ortiz murder leaves him criminally liable for the crime, but the nature of his involvement must be considered in sentencing him.  His involvement was no more nor less than "armed back up" of the government's closing argument. Far from premeditated, for Mr. Solis-Vasquez, it was an impulsive crime--he joined the crime when asked by Crazy.   He fired no shots, and was on the back porch when Vida Loca shot Ortiz to death and also gratuitously fired the shot at Saul Rivera.  While he does not deny taking credit for his role in the offense at the subsequent clique meeting, he told one of the government's cooperators confidentially that he thought at the time that "Vida Loca was just going to scare the man with the gun.  Instead, Vida Loca immediately shot the man and killed him."

In the context of this case, it is only fair to compare Mr. Solis-Vasquez's crimes to the long premeditated and singularly cruel and savage murders of Wilson Martinez, Christofer Perez de La Cruz, Irvin de Paz.

<u>Wilson Martinez</u>

Criminal          36 years

<u>Irvin De Paz</u>

Animal            40 years

<u>Christofer Perez de la Cruz</u>

Ninja             27 years, 6 months

Seco                    35 years

Jose Aguilar-Villanueva (Fantasma)

Psycho                  23 years

Terrible                21 years

Inocente                22 years, 4 months


Other considerations - Avoid Impinging on the Exercise of the Right to Trial

In this case, we submit that imposition of a sentence of life would risk impinging on the defendant's right to jury trial.

These sentences listed above were, we submit, imposed on MS-13 members guilty of more heinous conduct than Mr. Solis-Vasquez.  They are fair game for comparison even though some of them are the result of pleas, as they are still reasonable dispositions of the cases of similarly situated individuals.   In sentencing arguments in this case, the government has made much of the failure to "accept responsibility" of those defendants who exercised their right to trial.  The government has cited the purported "acceptance of responsibility" by those defendants who elected to plead guilty, as a reason which justifies sometimes vast sentencing differentials. The Court should be cautious in evaluating these arguments; it does not strain credulity to say that in in many cases, a defendant's decision to plead guilty is the result of a cost-benefit analysis, which has very little to do with the moral reckoning that the phrase "acceptance of responsibility" connotes.

Mr. Solis-Vasquez, simply put, should not be punished for electing to go to trial.  While that is a phrase with which few would disagree, we translate it to mean, in this case, that Mr.

Solis-Vasquez's sentence after trial should bear some reasonable relationship to the plea offers he was made prior to trial.  It should be within striking distance.  The government made two plea offers to Mr. Solis-Vasquez: the first, approximately a month before trial, was a (b)(1)(B) agreement by which the government would recommend no more than thirty years, while the defendant could request the Court impose any term of years.   The second agreement, hammered out during jury selection, entailed a (c)(1)(C) plea to 23 to 26 years.

At the time of these negotiations, the entirety of Mr. Solis-Vasquez's criminal conduct was known to the government.  That is to say, no information regarding criminal conduct emerged at trial that was not known to the government prior to trial.  Therefore, it stands to reason that the government's sentencing recommendation *could* have some relationship to these pretrial offers, with measured increases meant to incorporate the notion of acceptance of responsibility and having put the government to its burden.  The sentencing guidelines value these considerations as 2 and 1 offense levels, respectively.

Mr. Solis-Vasquez did not seriously contest at trial that he was a member of MS-13.  He tried the case on the theory that there was a reasonable doubt that he was the person identified as the "armed backup" for Vida Loca.   This was not a frivolous theory.  One contemporaneous recording, made by CW-1 (Pelon), of Crazy and Street Danger, did place Brujo at the scene.  However, Mr. Solis-Vasquez was not identified by any percipient witness, and the entirety of the other evidence tying him to this incident consisted of the testimony of two cooperating witnesses, who also were not percipient witnesses, but testified about what Mr. Solis-Vasquez had told them.

If 23-26 years was reasonable prior to trial, and no new information emerged, we submit it may be *unreasonable* to inflict the maximum punishment under law, more than doubling the sentence, where Mr. Solis-Vasquez tried the case under these circumstances.

The plea bargaining process may generate dispositions that are not necessarily meaningful at sentencing, in that the numbers can be seen to contain discounts or estimates of the parties' perceived litigation risk.   Here, however, the numbers have meaning.   It is clear the government had instrumental and strategic reasons to want to dispose of Mr. Solis' case, in particular to conserve and better deploy its resources against his co-defendants.  But the offered numbers (the 30 year cap, the 23 to 26 year range) were clearly also, in the government's view, <u>reasonable dispositions of the case</u>, all things considered, assuming the defendant accepted responsibility, and in light of the sentences already handed down or agreed to in the case.

If 26 years was a reasonable disposition of the case under the condition that Mr. Solis-Vasquez accepted responsibility, and spared the government the trouble and risk associated with trying him, what is a reasonable disposition under the condition that he went to trial?

<u>Conclusion</u>

WHEREFORE the Defendant respectfully requests the Court impose a sentence of 30 years imprisonment.


Respectfully submitted,
LUIS SOLIS-VASQUEZ,
By his attorney,


<u>/s/Ian Gold</u>
Ian Gold (BBO# 665948)
Law Office of Ian Gold
2 Mill & Main Place, Ste. 260 EF

Maynard, MA 01754
(617) 297-7686 (phone)
ian.gold@iangoldlaw.com

Date:  November 16, 2018

### CERTIFICATE OF SERVICE

I hereby certify that true copies of this document will be served on the registered parties through the ECF system on this date, Nov. 16, 2018.

/s/Ian Gold
Ian Gold